HOMAN & CRIMEN, INC., et al.,
Plaintiffs-Appellees,

v.

Patricia Roberts HARRIS, Secretary of Health and Human Services, Defendant-Appellant.

No. 78–3364.

United States Court of Appeals, Fifth Circuit.

Oct. 1, 1980.

Jamie C. Boyd, U. S. Atty., San Antonio, Tex., Janet Ruesch, Asst. U. S. Atty., El Paso, Tex., Willaim Kanter, Dept. of Justice, Civil Div., Appellate Section, Washington, D.C., Suzanne Cochran, Asst. Regional Atty., Dept. of H.E.W., Dallas, Tex., for defendant-appellant.

Patric Hooper, Robert A. Klein, Los Angeles, Cal., for plaintiffs-appellees.

Before WISDOM, RONEY and HATCH-ETT, Circuit Judges.

RONEY, Circuit Judge:

The Secretary of Health and Human Services appeals from a judgment of the district court reversing her determination that increased Medicare reimbursement for

indirect costs such as depreciation, interest and return on equity cannot be based on a step-up in basis resulting when all the stock of a Medicare provider is purchased but the corporate provider continues to own the assets. Finding that the Secretary's interpretation of the Medicare Act and the regulations issued pursuant thereto are reasonable and entitled to judicial deference, we reverse.

## A. BACKGROUND

The Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C.A. §§ 1395–1395rr, was enacted in 1965 and created a broad program of health insurance for the aged and disabled. Part A of the Medicare Act provides hospital insurance and covers expenses of hospital and certain post-hospital services. Under Part A, hospitals which participate in the program are designated "providers of services" and are paid the reasonable costs of services provided to Medicare patients. 42 U.S.C.A. §§ 1395x(u) and 1395f(b).[1]

The "reasonable costs" of care rendered to Medicare beneficiaries, for which "providers" are entitled to receive reimbursement, are defined by statute and regulations. 42 U.S.C.A. § 1395x(v)(1)(A) and (B);[2] 42 C.F.R. §§ 405.401–.544 (1979). In

1. 42 U.S.C.A. § 1395x(u):

The term "provider of services" means a hospital, skilled nursing facility, or home health agency, or, for purposes of section 1395f(g) and section 1395n(c) of this title, a fund.

42 U.S.C.A. § 1395f(b):

(b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1395e of this title, be—

(1) the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title, or (B) the customary charges with respect to such services; or

(2) if such services are furnished by a public provider of services free of charge or at nominal charges to the public, the amount determined on the basis of those items (specified in regulations prescribed by the Secretary) included in the determination of such reasonable cost which the Secretary finds will provide fair compensation to such provider for such services.

2. 42 U.S.C.A. § 1395x(v)(1)(A) and (B):

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimburse-

addition to defining reimbursable reasonable costs as those directly related to patient care services such as nursing care and drugs, the regulations, as required by statute, allow reimbursement of indirect costs required for patient care, such as depreciation on buildings and equipment, interest incurred on loans and a return on equity capital. It is reimbursement for these indirect costs which is at issue in this case.

## B. FACTS

The material facts are not in dispute. On January 1, 1972, Medenco, Inc., through its wholly owned subsidiary Southwestern General Hospital, Inc., purchased 100% of the stock of Homan & Crimen, Inc., an unrelated corporation doing business as Southwestern General Hospital. The purchase price was $1 million in cash and notes. The transaction was negotiated at arms length and the price reflected the fair market value of the hospital and its assets.

Immediately following the purchase, Medenco assumed complete management and control over the operation of the hospital. Although operating through the corporate form, Medenco in effect installed its own management team, negotiated new contracts for ancillary services, terminated the previously existing pension plan and removed bank accounts to new banks. A $1.5 million capital expenditure program resulted in a complete renovation of the facility. Homan & Crimen, however, was never liquidated and it continued to own the assets and participate in the Medicare program under the same provider agreement.

The purchase price plus other costs associated with the acquisition exceeded the net book value of the hospital by almost $830,000. When Homan & Crimen, d/b/a Southwestern General Hospital, submitted its

Medicare cost reports for the 1972 and 1973 fiscal years, it claimed the $830,000 as a step-up in the cost basis of its assets, which resulted in higher claimed reimbursement for depreciation, interest, and return on equity capital. The additional reimbursement on the $830,000 step-up was disallowed by the Secretary's intermediary. Plaintiff appealed those disallowances to the Provider Reimbursement Review Board (PRRB), a five-member panel of experts authorized by Congress to resolve such disputes. 42 U.S. C.A. § 1395oo. The PRRB reversed the decision of the intermediary and allowed the additional reimbursement, ruling that the purchase of 100% of the Homan & Crimen stock and actual assumption of management by Medenco constituted a purchase of an ongoing hospital operation.

■ Under 42 U.S.C.A. § 1395oo (f) and 42 C.F.R. § 405.1875 (1979), the Secretary, on her own motion and at her discretion, may review a decision of the PRRB and on review has all the powers she would have if making the initial determination. 5 U.S.C.A. § 557(b). Thus the decision of the PRRB carries no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling. The argument that the court should recognize the expertise of the members of the PRRB must be met with the assumption that those persons within the agency who assisted the Secretary in a contrary decision must be regarded as being equally expert. Pursuant to her authority, the Secretary (through the Social Security Commissioner) reviewed the PRRB's decision and held that the stock acquisition transaction was not a change of ownership which would justify stepping up the cost basis of the assets from the historical cost of the assets to Homan & Crimen. That

ment produced by the methods of determining costs proves to be either inadequate or excessive.

(B) Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other al-

lowances to the extent that they reflect similar items. The rate of return recognized pursuant to the preceding sentence for determining the reasonable cost of any services furnished in any fiscal period shall not exceed one and one-half times the average of the rates of interest, for each of the months any part of which is included in such fiscal period, on obligations issued for purchase by the Federal Hospital Insurance Trust Fund.

decision was in turn challenged in federal district court by Medenco, Southwestern General Hospitals, Inc., and Homan & Crimen.

The statute permitting district court review of the Secretary's reversal of a PRRB decision, 42 U.S.C.A. § 1395oo(f),[3] applies only to fiscal years ending on or after June 30, 1973. Social Security Amendments of 1972, Pub.L. 92–603, § 243(c), 86 Stat. 1329 (1972), *as amended by* Act of Oct. 26, 1974, Pub.L. 92–484, § 3, 88 Stat. 1459 (1974). As to earlier fiscal years, we held in *Dr. John T. McDonald Foundation v. Califano*, 571 F.2d 328 (5th Cir.) (*en banc*), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978), that the district court has no jurisdiction to hear providers' appeals but that such cases may be transferred to the Court of Claims. Pursuant to that opinion, the district court ordered the claim for fiscal year 1972 transferred to the Court of Claims. That order is not appealed here.

The plaintiffs' claims for fiscal year 1973 were reviewed by the district court. The court, under the standard of review in 5 U.S.C.A. § 706,[4] found the Secretary's interpretation to be in conflict with the statute

requiring that costs related to delivery of services to Medicare patients not be borne by non-Medicare patients. The district court reversed the determination of the Secretary and directed that the decision of the PRRB be reinstated. This appeal followed.

Both parties recognize that at the time this dispute arose, no single provision of the Medicare regulations explicitly resolved the issue. On February 5, 1979, the Secretary published amendments to the regulations which specifically resolved the conflict in favor of the Secretary's interpretation. 44 Fed.Reg. 6912 (1979). The amendments by their own terms have prospective application only, so they do not control here. The Secretary contends, however, that the position articulated by the amended regulation has been the policy of her department since the inception of Medicare and that the regulation is designed merely to "state explicitly" that policy.

## C. DECISION

### 1. *Reimbursement Under the Regulations*

The plaintiffs seek reimbursement for depreciation allowance, interest expenses, and

---

**3.** 42 U.S.C.A. § 1395oo(f):

A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of Title 5, notwithstanding any other provisions in section 405 of this title.

**4.** 5. U.S.C.A. § 706:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 393.

return on equity capital. Each of these items will be treated separately.

*Depreciation.* The allowability of reimbursement for depreciation is determined by 42 C.F.R. § 405.415. Section 405.415(a) [5] establishes three requirements before depreciation can be considered an allowable cost: (1) it must be identifiable and recorded in the provider's accounting records; (2) it must be based on the historical cost of the asset (or market value in the case of a donated asset); and (3) it must be prorated over the estimated useful life of the asset. "Historical cost" is defined in section 405.-415(b)(1) as "the cost incurred by the present owner in acquiring the asset."

The Secretary interprets these provisions as disallowing a depreciation reimbursement based on any stepped-up basis resulting from Medenco's purchase of the Homan & Crimen stock. The Secretary contends that the first two requirements were not met. As to the first, she argues that the additional investment would be recorded only on the books of Medenco, not those of Homan & Crimen. Plaintiffs assert, however, that Homan & Crimen's records are to be kept according to generally accepted accounting principles, citing 42 C.F.R. § 405.406(a) and *Saint Francis Memorial Hospital v. Weinberger,* 413 F.Supp. 323, 326 (N.D.Cal.1976), and under those accounting principles, the additional cost basis may be recorded on the books of Me-

denco's wholly-owned subsidiary, Homan & Crimen, and in fact have been. Because we determine that the second requirement is not met, and therefore the additional depreciation cost is not allowable, the results of this skirmish over accounting principles will not affect the outcome of the battle and we decline to resolve it.

The Secretary's argument with respect to the second requirement of allowability is quite simple. Under well-established principles of corporate law, the corporation, not the shareholders, is the owner of the corporate assets. Homan & Crimen is thus the present owner of the assets in question. Its costs in acquiring the assets are the historical costs upon which depreciation reimbursement must be based.

■ The plaintiffs seek to avoid this construction by arguing that the appropriate regulation is 42 C.F.R. § 405.415(g).[6] That subsection states that in the case of a bona fide purchase of a facility as an ongoing operation, the basis of the assets for depreciation purposes is the lower of the total price paid for the facility by the purchaser, the fair market value, or the net current reproduction cost. Plaintiffs point out that under this language, the cost may be incurred by the "purchaser" and not necessarily by the "provider."

Were this transaction a purchase of assets, plaintiffs' argument would have merit.

---

**5.** 42 C.F.R. § 405.415(a):

(a) *Principle.* An appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost. The depreciation must be:

(1) Identifiable and recorded in the provider's accounting records;

(2) Based on the historical cost of the asset or fair market value at the time of donation in the case of donated assets; and

(3) Prorated over the estimated useful life of the asset . . . . .

**6.** 42 C.F.R. § 405.415(g):

(1) *Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, shall be the lowest of:

(i) The total price paid for the facility by the purchaser, as allocated to the individual assets of the facility; or

(ii) The total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) The combined fair market value of the individually identified assets at the time of the sale.

(2) *Assets acquired after July 31, 1970.* For depreciable assets acquired after July 31, 1970, in addition to the limitations specified in paragraphs (g)(1) of this section, the cost basis of the depreciable assets shall not exceed the current reproduction cost depreciated on a straightline basis over the life of the assets to the time of the sale.

(3) *Transactions other than bona fide.* If the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraphs (g)(1) and (2) of this section, the purchaser's cost basis shall not exceed the seller's cost basis, less accumulated depreciation.

In this case, however, there was no purchase of a "facility," but only the purchase of corporate stock. Following the stock purchase there was no corporate liquidation and therefore no two-step stock purchase and liquidation considered to be a purchase of assets by the Ninth Circuit in *Pacific Coast Medical Enterprises, Inc. v. Harris*, Nos. 77–2914, 77–3281 (9th Cir. 1980). Since no assets and no facility, as such, were ever purchased, 42 C.F.R. § 405.415(g) is not applicable here.

Plaintiffs also argue that under 42 C.F.R. § 405.427,[7] the costs of an organization related to the provider are deemed the costs of the provider for reimbursement purposes. Under that section the amount of reimbursement the provider can claim when "items of services, facilities or supplies" are obtained from a related organization is limited to the cost of such services, facilities or supplies to the related organization. This argument must be rejected. In the first place, at the time the $1 million was paid to Homan & Crimen's stockholders by Medenco, the corporations were not related. In the second place, Medenco's investment of capital in Homan & Crimen stock is not an item of services, facilities or supplies. Consequently section 405.427 does not apply. As the Secretary points out, the essential purpose of section 405.427 is to prohibit related organizations from artificially raising the price to the provider and thereby extracting a double profit from Medicare transactions.

Plaintiffs press their point further by pointing out that section 405.427 indicates that under the regulations form should not be exalted over substance and the fiction of the separateness of the corporation and its shareholders should not be used to reach an unfair and unjust result. To this contention the response must be that if the separateness of the corporation and its shareholders is a fiction, it is one which the law has long recognized and will not lightly go behind. *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973); *First National Bank v. Gamble*, 134 Tex. 112, 132 S.W.2d 100 (1939). For the regulation to cut through or ignore that mass of established corporate law upon which the Secretary relied would require at the very least a clear intention, a compelling case. It cannot be done by implication as plaintiffs suggest here.

We recognize, of course, that the corporate entity may and should be disregarded "in such cases as fraud, violation of law or contract, public wrong, or to work out the equities among members of the corporate internally." 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 25, at p. 99 (rev.perm.ed. 1974). None of these circumstances are sufficiently present here to require the Court to "energize the equitable power to disregard the corporate form." *Maley v. Carroll*, 381 F.2d 147, 154 (5th Cir. 1967). Medenco and Southwestern General Hospital, Inc. have enjoyed whatever advantages there were which prompted them to choose for themselves this particular corporate arrangement and they may not now seek to have the arrangement disregarded in the absence of clear law that it must be. Section 405.427 is designed to prevent artificially inflated profits and fraudulent double profits. It is not so clearly controlling as to require the Secretary to apply it in this case.

The Secretary's position that depreciation must be based on the historical cost to the present owner and that Homan & Crimen is the present owner is not only reasonable but in accord with settled law in related fields. Where the agency interpretation of its own regulations is reasonable, it must stand even though it may not ap-

---

7. 42 C.F.R. § 405.427:

 (a) *Principle.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

pear as reasonable as some other. *Expedient Services, Inc. v. Weaver*, 614 F.2d 56, 57 n.1 (5th Cir. 1980); *Allen M. Campbell Construction Co. General Contractors, Inc. v. Lloyd Wood Construction Co.*, 446 F.2d 261, 265 (5th Cir. 1971). The Secretary cannot be reversed for rejecting plaintiffs' claim for reimbursement for depreciation based on the stepped-up cost.

*Interest expense.* Reimbursement of interest expense is governed by 42 C.F.R § 405.419.[8] Section 405.419(a) states that "[n]ecessary and proper interest on both current and capital indebtedness is an allowable cost" for which the provider may be reimbursed. Section 405.419(b)(2) specifies that for interest to be reasonable, it must be incurred on a loan "made to satisfy a financial need of the provider" and "made for a purpose reasonably related to patient care."

 The additional interest expense for which plaintiffs seek reimbursement is the interest due on the notes given by Medenco for the purchase of the Homan & Crimen stock. It is clear that the loan neither satisfies a financial need of the provider nor is reasonably related to patient care. *See American Medical International, Inc. v. Secretary*, 466 F.Supp. 605, 623 (D.D.C.1979). To become a provider, an entity must enter into a contract with the Secretary, as specified in 42 U.S.C.A. § 1395cc. In this instance, the only entity to enter into such a contract was Homan & Crimen. Thus, Homan & Crimen and not Medenco is the provider. The purpose of the loan was to finance Medenco's investment in Homan & Crimen stock. The Secretary could properly disallow the interest expense for reimbursement purposes.

 *Return on equity capital.* The allowable return on equity capital of proprietary providers is defined in 42 C.F.R. § 405.429. Section 405.429(b)(1) reads in part:

> For purposes of computing the allowable return, the provider's equity capital means:
>
> (i) The provider's investment in plant, property and equipment related to patient care (net of depreciation) and funds deposited by a provider who leases plant, property, or equipment related to patient care and is required by the terms of the lease to deposit such funds . . . and
>
> (ii) Net working capital maintained for necessary and proper operation of patient care activities.

It is clear from this regulation that equity capital upon which a return may be based

---

8. 42 C.F.R. § 405.419:

(a) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost. However, interest cost incurred as a result of judicial review by a Federal court as described in § 405.454(1)) is not an allowable cost.

(b) *Definitions*—(1) *Interest.* Interest is the cost incurred for the use of borrowed funds. Interest on current indebtedness is the cost incurred for funds borrowed for a relatively short term. This is usually for such purposes as working capital for normal operating expenses. Interest on capital indebtedness is the cost incurred for funds borrowed for capital purposes, such as acquisition of facilities and equipment, and capital improvements. Generally, loans for capital purposes are long-term loans.

(2) *Necessary.* Necessary requires that the interest:

(i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

(ii) Be incurred on a loan made for a purpose reasonably related to patient care.

(iii) Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court (as described in § 405.-454(1)) is not used to reduce interest expense.

(3) *Proper.* Proper requires that interest:

(i) Be incurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made.

(ii) Be paid to a lender not related through control or ownership, or personal relationship to the borrowing organization. However, interest is allowable if paid on loans from the provider's donor-restricted funds, the funded depreciation account, or provider's qualified pension fund.

must be the provider's and it must be related to patient care. In view of our holding that Homan & Crimen is the provider because its separate identity should not be disregarded and that Medenco's investment in Homan & Crimen stock was not an investment related to patient care, it follows that plaintiffs are not entitled to a return on the purchase price of stock.

2. *Retroactivity of Unpublished Policy*

■ Plaintiffs contend that the Secretary, in distinguishing between a 100% stock purchase and a purchase of corporate assets in allowing reimbursable costs, is acting without regulatory authority and has attempted to support her decision through retroactive application of an unpublished policy. In particular, plaintiffs object to a letter written by Irwin Wolkstein of the Bureau of Health Insurance to an official of Blue Cross some two years after the transaction at issue here in which Mr. Wolkstein took the position that a 100% stock purchase would not permit a step-up in the purchased corporation's cost basis. This letter was cited by the Secretary's intermediary in denying the reimbursement plaintiffs now seek. Application of the Wolkstein letter to this case is invalid, plaintiffs argue, because the letter was written several years after the purchase here and because it announced a substantive change in Medicare policy without following the rulemaking requirements of the Administrative Procedures Act, 5 U.S.C.A. § 553.

■ As shown by our above discussion dealing with depreciation, interest and return on equity capital, the Secretary's position in denying reimbursement under these facts is adequately stated in the regulations. The effect of the Wolkstein letter, therefore, is merely to elaborate on what is already contained in the regulations. The letter did not announce a substantive change but at most was an interpretation of the regulations. "Interpretative rules" are specifically exempt from the notice and hearing requirements of the Administrative Procedures Act. 5 U.S.C.A. § 553(b)(A). The allegation that the Wolkstein letter and the Secretary's position in this case amount

to a sudden shift in agency interpretation is effectively refuted by the fact that the regulations make no provision whatsoever for the myriad of administrative difficulties that would arise if step-up basis were permitted for stock purchases, such as valuation and allocation of values to various assets. In addition, as early as 1969 an opinion of HEW's Office of the General Council, subsequently published in both [1969] Medicare-Medicaid Guide (CCH) ¶ 26036 and *Hearings Before the Senate Comm. on Finance*, 91st Cong. 1st Sess. 270–74 (1969), adopted this same view of the regulations. We accordingly reject plaintiffs' contention.

3. *Consistency with the Statutory Mandate*

The district court held, and plaintiffs argue, that the reimbursement regulations, as interpreted by the Secretary here, violate the statute under which those regulations were promulgated. The definition of "reasonable cost" under the Medicare Act is found in 42 U.S.C.A. § 1395x(v)(1)(A).

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; . . . .

A later portion of that same subsection requires that

[s]uch regulations shall . . . take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .

Section 1395x(v)(1)(B) contains the additional requirement that

[s]uch regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services . . .

Relying on this statutory language, plaintiffs present the following argument: The economic reality of Medenco's purchase, regardless of the specific legal form it took is that Medenco has invested $1 million in buying an ongoing proprietary hospital (plus an additional $1.5 million in capital improvements). The presumption underlying that investment was that it would yield a return from the sale of hospital services. Yet under the Secretary's interpretation of the regulations, the actual and generally recognized indirect costs of operating the hospital—depreciation, interest and return on equity—costs which the investors expect to recover regardless of the nature of their investments, are not being fully shared by the Medicare program. The consequence of the Secretary's position is that charges to non-Medicare patients will be increased so as to cover costs universally recognized as attributable to the hospital's operation. The Secretary's interpretation of the principles of reimbursement are thus in conflict with the statutory mandate that there is to be a reasonable return on equity capital (based on investment in a "facility" without regard to whether the investment was by provider or another) and that the costs of rendering care to Medicare patients are not to be shifted to non-Medicare patients. Because the agency's interpretation is inconsistent with the congressional purpose, it is entitled to no deference and in fact must be rejected. *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

■ This is a strong argument which might well command our attention were we making the agency decision or devising the agency regulations. The standard of judicial review, however, requires that the agency decision be upheld if it is reasonably consistent with the statute. *Weinberger v. Salfi*, 422 U.S. 749, 777, 95 S.Ct. 2457, 2472,

45 L.Ed.2d 522 (1975); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The statutory language limits reasonable costs to costs "actually incurred." Since under 42 U.S.C.A. § 1395f payments are made only to providers, it is reasonable to construe this language as meaning that reasonable costs are limited to those costs "actually incurred" by the *provider* or, at the very least, on behalf of the provider. See *American Medical International, Inc. v. Secretary*, 466 F.Supp. at 622–23. The provider, of course, is Homan & Crimen and it did not incur the additional costs, nor were the costs incurred on its behalf. A change in stock ownership and the resulting change in management may well be beneficial to a hospital, but not necessarily so, and any benefit is unrelated to the price of the stock.

■ The Secretary's position is reasonable in that it is grounded on long-established corporate principles. We cannot lightly impute to Congress the intent to *require* the Secretary to disregard hornbook principles of corporate law.

■ The Secretary's interpretation is reasonable because it avoids other problems present in a stock purchase acquisition. The purchase price paid for the stock may not accurately reflect the value of the assets used to deliver health care because it is more likely to be a reflection of the acquired corporation's earning capacity. It is possible for the parties to manipulate the allocation of the purchase price between tangible and intangible assets. In addition, if only part of the stock is purchased or if all the stock is purchased in a number of different transactions at different price levels, it would be an administrative burden to measure the basis of the assets or the amount by which the basis is increased. While all of these circumstances may not be present here, the possible presence of such circumstances forms a rational basis for interpreting the statute and the regulations so as to differentiate between the purchase of the provider's stock and the purchase of the provider's assets.

We conclude, therefore, that the Secretary's position that the purchase of a provider's stock does not justify a stepped-up basis for Medicare reimbursement is reasonable and not inconsistent with the statute. Because her action is in accordance with the statute and regulations and not arbitrary or capricious, the Secretary's decision is due to be affirmed.

The judgment of the district court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.